IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TC HEARTLAND LLC, | ) | |
| | ) | |
| Plaintiff and Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | 1:23-CV-665 |
| | ) | |
| SUSAN S. SCHIFFMAN, | ) | |
| | ) | |
| Defendant and Counterclaim | ) | |
| Plaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, Chief District Judge.

The plaintiff, TC Heartland LLC, sells Splenda, an artificial sweetener. It disliked the public comments about Splenda and its component sucralose made by the defendant, Dr. Susan Schiffman, after publication of her research about sucralose in a peer-reviewed scientific journal, so it sued her for defamation. Dr. Schiffman similarly disliked Heartland's online assertions impugning her scholarship and integrity, so she sued them right back, asserting defamation claims and an abuse of process claim. Cross-motions for summary judgment have been filed.

Both Dr. Schiffman and Heartland have a First Amendment right to express their views on the safety and health effects of Splenda and sucralose and on the meaning and validity of research investigating those health and safety issues. Neither party has produced sufficient evidence to overcome the other's First Amendment right to talk about the research and the conclusions to draw from the scientific research, and neither has

shown a disputed question of material fact.  All of their claims and counterclaims will be dismissed, and the parties can return to the marketplace of ideas and laboratories to duke out their differences over artificial sweeteners.

## I.  Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party."  *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023).  The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the nonmoving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial.  *Id.* at 709–10; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (cleaned up); *see also Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 878 (4th Cir. 2023).  "When considering each individual motion, the court must take care to

resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol*, 316 F.3d at 523 (cleaned up).

## II.     Undisputed Facts

Splenda is an artificial sweetener containing sucralose.  Doc. 126 at ¶ 27; Doc. 132 ¶ 27.  Heartland produces and sells Splenda.  Doc. 126 at ¶ 27; Doc. 132 ¶ 27.

In 2023, Dr. Schiffman, a professor at North Carolina State University, and co-authors published an article about the effects of sucralose and sucralose-6-acetate ("S6A") in a peer-reviewed journal.  Doc. 150-2.  The text of the article does not mention Splenda.[1]  *See id*.  Dr. Schiffman did not conduct the experiments discussed in the article; those were conducted by a lab hired to do the experiments.  *Id*. at 6.

After the article was published, Dr. Schiffman worked with N.C. State to issue a press release about her research.  Docs. 153-56, 154-5.  The press release discussed the article's conclusions and Splenda itself.  Doc. 154-5.  Local news stations interviewed her about the article, and she discussed Splenda in those interviews.  Docs. 154-4, 154-76.  A few other news sources reported on the article and published stories with her statements about her research.  *See e.g.*, Docs. 154-12, 154-28.  In summary, she said that her research showed that sucralose carries multiple potential health risks, and she identified sucralose with Splenda.  *See infra* at 10–11.

In response to Dr. Schiffman's published article on sucralose and subsequent statements about the article and Splenda, Heartland created a webpage disputing her

---

[1] Two of the sources cited in the article have "Splenda" in their title.  Doc. 150-2 at 29, 35.

article's findings, her statements about the article, and the article's implications.  Doc. 162-18.  It impugned the quality of her research and essentially accused her of being a publicity hound.  *See infra* at 27.

Additional facts will be discussed as issues arise.

### III.    The Causes of Action

Heartland asserts state law claims against Dr. Schiffman that it labels as claims for slander, Doc. 126 at ¶¶ 179–86, libel, *id*. at ¶¶ 187–95, and trade libel/product disparagement/ injurious falsehood.  *Id*. at ¶¶ 196–200.  These defamation claims are based on allegedly false statements she made about Splenda, sucralose, and S6A in the press release and one news interview about her recently-published research.  *See* Doc. 224 (clarifying the statements it alleges are defamatory).

In the operative counterclaims, Dr. Schiffman asserts state law claims against Heartland for abuse of process, Doc. 128 at ¶¶ 23–72, and libel as to statements made about her research motives and the soundness of her science.  *Id*. at ¶¶ 77–115.  Her claims are based on statements that Heartland published on its public-facing website.  *See* Doc. 215-2 at 15.

The parties agree that North Carolina law applies.

Both parties brought claims for unfair and deceptive trade practices.  They have since stipulated to dismissal of those claims.  Doc. 164.

### IV.    Defamation Law

In North Carolina, libel and slander are two forms of defamation.  *Cannon v. Peck*, 36 F.4th 547, 559 (4th Cir. 2022) (citing *Tallent v. Blake*, 57 N.C. App. 249, 251, 291

4

S.E.2d 336, 338 (1982)). "Libel is written, while slander is oral." *Id.* (cleaned up). To prevail on a defamation claim under North Carolina law, the plaintiff must establish: (1) the defendant made a false, defamatory statement; (2) the statement was "of or concerning" the plaintiff; (3) the statement was published to a third party; and (4) the statement caused injury to the plaintiff's reputation. *E.g., Boyce & Isley, PLLC v. Cooper*, 211 N.C. App. 469, 478, 710 S.E.2d 309, 317 (2011); *Bouvier v. Porter*, 386 N.C. 1, 10, 900 S.E.2d 838, 846 (2024).

If the subject of the statement is a public figure, the plaintiff must also prove that the defendant acted with actual malice. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). The Supreme Court has recognized two types of public figures: (1) all-purpose public figures, who have achieved "such pervasive fame or notoriety" such that they are public figures "for all purposes and in all contexts," and (2) limited-purpose public figures, who have "voluntarily injected themselves into a particular public controversy" and thereby became public figures "for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (cleaned up).

Defamation claims are further "circumscribed by the First Amendment protections of free speech." *McGlothlin v. Hennelly*, 370 F. Supp. 3d 603, 614 (D.S.C. 2019). Consistent with the elements of the cause of action, the First Amendment requires that statements "be provable as false before there can be liability under state defamation law." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20, (1990). "The First Amendment will fully protect statements that cannot reasonably be interpreted as stating actual facts." *See Snyder v. Phelps*, 580 F.3d 206, 218 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) (cleaned

5

up).  The First Amendment also protects statements of opinion incapable of being proven false.  *Milkovich,* 497 U.S. at 19–20; *see also Craven v. Cope*, 188 N.C. App. 814, 817, 656 S.E.2d 729, 732 (2008).  Whether a statement is one of actionable fact is a question of law for the court based on a fact-specific analysis of a "statement's language and context to determine if it could be interpreted as asserting a fact."  *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184–86 (4th Cir. 1998) (analyzing fact versus opinion as a matter of law); *see also Potomac Valve & Fitting Inc. v. Crawford Fitting Co.,* 829 F.2d 1280, 1285 n.12 (4th Cir. 1987) (noting that "[w]hether a statement constitutes fact or opinion is a question of law for the trial court to decide.").

Scientific conclusions based on research and speech about that research do not fit easily into the fact-opinion paradigm.  *See ONY, Inc. v. Cornerstone Therapeutics, Inc.,* 720 F.3d 490, 496 (2d Cir. 2013); *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists*, *Inc*. (*Pacira I*), 583 F. Supp. 3d 654, 658 (D.N.J. 2022), *aff'd*, 63 F.4th 240 (3d Cir. 2023).  The Court agrees with the Second and Third Circuits that such speech receives First Amendment protection under certain conditions to encourage legitimate debate about scientific issues and to encourage discussion and research into matters of public and scientific interest.

The reasons for this protection have been persuasively summarized by the Second Circuit:

> Most conclusions contained in a scientific journal article are, in principle, "capable of verification or refutation by means of objective proof," *Phantom Touring, Inc. v. Affiliated Publ'ns,* 953 F.2d 724, 728 n. 7 (1st Cir. 1992). Indeed, it is the very premise of the scientific enterprise that it engages with empirically verifiable facts about the universe. At the same time, however, it

6

is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation. Importantly, those conclusions are presented in publications directed to the relevant scientific community, ideally in peer-reviewed academic journals that warrant that research approved for publication demonstrates at least some degree of basic scientific competence. These conclusions are then available to other scientists who may respond by attempting to replicate the described experiments, conducting their own experiments, or analyzing or refuting the soundness of the experimental design or the validity of the inferences drawn from the results. . . . Needless to say, courts are ill-equipped to undertake to referee such controversies. Instead, the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury.

*ONY*, 720 F.3d at 496–97; *see* discussion *infra* at 12–13.

## V. Both Parties are Public Figures

Whether a person is a public figure is a question of law. *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001); *see Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966) (noting that "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show respondent to be a 'public official.'"). The party that makes the allegedly defamatory statements has the burden of proving that the plaintiff is a public figure to impose a requirement that the plaintiff show actual malice. *Carr*, 259 F.3d at 278. In the "limited-purpose public figure context" applicable here," *Gertz*, 418 U.S. at 351, courts make this decision by evaluating whether there was a "public controversy" that "gave rise to" the allegedly defamatory statement and, if so, whether the speaker's "participation in that controversy sufficed to establish him as a public figure within the context of that public controversy." *Carr*, 259 F.3d at 278.

As to Heartland's claim that it has been defamed by Dr. Schiffman, Dr. Schiffman has produced plenary evidence that Heartland is a public figure. Sucralose, the chemical base of Splenda, was the subject of a food additive petition before the FDA, *see* Doc. 162-4, and the submission included evidence of safety testing as part of the FDA filings. *See id.* Heartland maintains a public website about Splenda that regularly and affirmatively addresses safety and health, *see, e.g.*, Doc. 162-11, it employs a public relations firm, Doc. 181-7, and it sells millions of dollars of Splenda every year. Doc. 176-16. Heartland has issued press releases for years affirmatively asserting that Splenda is safe and "healthy," *see, e.g.* Doc. 162-9; Doc. 162-12 at 3, 5; Doc. 162-3 at 4, and disputing findings or assertions by others, including the World Health Organization, that might be understood to the contrary. Doc. 162-7.

Heartland contends that it is not a public figure and thus only has to prove that Dr. Schiffman acted negligently when she made the statements at issue. But it has produced no evidence to support that assertion, and the argument that Heartland is not a limited-purpose public figure borders on the ridiculous. As to its speech about whether Splenda is a safe product or can be used as part of a healthy diet, Heartland is a public figure.

While a closer question, Dr. Schiffman is also a public figure for purposes of her statements made about Splenda, sucralose, and S6A. The Supreme Court has made clear that academic writings alone do not make someone a public figure. *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). Heartland's reliance on these publications is not persuasive. But as discussed, there was a public controversy about the safety and health effects of Splenda and sucralose that predated Dr. Schiffman's statements. That debate

8

includes a guideline article by the World Health Organization about artificial sweeteners and sucralose made days before Dr. Schiffman's statements were made, Doc. 162-5, and Heartland's public response to that article. Doc. 162-7.

Heartland's evidence shows that Dr. Schiffman voluntarily injected herself into the controversy by preparing a press release about her research and making statements to media outlets about that research, which invited a significant degree of public attention and comment. *Hutchinson*, 443 U.S. at 135; Docs. 153-56, 154-5, 154-4, 154-76, 154-12, 154-28. In her remarks, she advised the public to stop using consumer artificial sweeteners like Splenda, thus attempting to influence the public debate about Splenda's safety. While Dr. Schiffman contends that she "merely added her voice" to the discussion, this overlooks her role in preparing the press release, and she has offered no evidence that she later spoke about her research only in response to inquiries from the media. Dr. Schiffman's conduct was closer to that described in *Carr*, where a developer was held to be a limited-purpose public figure, 259 F.3d at 279–80, than in *Hutchinson*, where a research scientist only entered the public debate after the allegedly defamatory remarks were made and who, as a result, was involuntarily dragged into the controversy. 443 U.S. at 135; *see also Wolston v. Reader's Dig. Ass'n*, 443 U.S. 157, 166 (1979).

## VI. Heartland's Defamation Claims

### A. Dr. Schiffman's Statements that Heartland Alleges are Defamatory

Heartland alleges that Dr. Schiffman's statements in a May 31, 2023, N.C. State press release and a June 1, 2023, WRAL news interview are defamatory. Doc. 224. The specific press release statements that Heartland contends are defamatory are:

9

(1) A new study finds a chemical formed when we digest a widely used sweetener is "genotoxic," meaning it breaks up DNA. The chemical is also found in trace amounts in the sweetener itself, and the finding raises questions about how the sweetener may contribute to health problems. . . . "Our new work establishes that sucralose-6-acetate is genotoxic," . . . "We also found that trace amounts of sucralose-6-acetate can be found in off-the-shelf sucralose," . . . "Our work suggests that the trace amounts of sucralose-6-acetate in a single, daily sucralose-sweetened drink exceed that threshold [of toxicological concern]." . . . "In short, we found that sucralose-6-acetate is genotoxic . . . ."

(2) "When we exposed sucralose and sucralose-6-acetate to gut epithelial tissues – the tissue that lines your gut wall – we found that both chemicals cause 'leaky gut.' Basically, they make the wall of the gut more permeable. The chemicals damage the 'tight junctions,' or interfaces, where cells in the gut wall connect to each other. A leaky gut is problematic, because it means that things that would normally be flushed out of the body in feces are instead leaking out of the gut and being absorbed into the bloodstream."

(3) "We found that gut cells exposed to sucralose-6-acetate had increased activity in genes related to oxidative stress, inflammation and carcinogenicity."

*Id*. at 2. The specific news interview statements are:

(4) "Yeah. Well, it breaks it up. That's a pretty big deal."

(5) "And when it gets into the gut, it can induce genes, which are, you know, part of DNA, and it can cause inflammation and even cancer."

(6) "Well, this is what's really interesting that we found, is that the amount of sucralose-6-acetate, this compound that is in a single packet of Splenda or in one drink, is enough to exceed what's called the -- it's called the threshold of toxicological concern. It's the level used in the food industry and in Europe, at the European food agencies, to say that this is too much genotoxic compound in the food supply. And so a single packet is too much."

(7) "Okay. Risk wise, sucralose is worse [compared to other artificial sweeteners]."

10

(8) "So basically, the data shows it's not a good idea to consume sucralose."

*Id*. at 3.  Heartland also contends that the "overall message" of Dr. Schiffman's press release and interview are false and defamatory.  *Id*. at 4.

### B.  Heartland's Motion

Heartland contends that it is entitled to summary judgment on two aspects of its defamation claims against Dr. Schiffman.

First, Heartland asks the Court to hold that it is not a public figure so that it only needs to show that Dr. Schiffman's statements were made negligently.  Doc. 183-1 at 10, 35–36.  The Court has already addressed Heartland's status as a public figure *supra*.  This part of its motion will be denied.

Second, Heartland contends that it is entitled to partial summary judgment on the element of publication.  *Id*. at 37 (asking the Court to hold that Dr. Schiffman "published defamatory statements").  Dr. Schiffman acknowledges that she appeared on the local news and made the statements about her research.  Doc. 162 at 30.  This constitutes publication to a third party.  *See Bell v. Simmons*, 247 N.C. 488, 494, 101 S.E.2d 383, 387–88 (1958) (stating the rule that speaking to a reporter who plans to write an article constitutes slander and libel, if the words are subsequently printed).

Heartland is entitled to partial summary judgment in its favor on the publication element of its defamation claims.  This part of Heartland's motion will be granted.

### C.  Dr. Schiffman's Motion

Dr. Schiffman moves for summary judgment on all of Heartland's claims against her, contending that her statements about her research are protected by the First

11

Amendment. As noted, Dr. Schiffman made the statements that Heartland alleges are defamatory to the public in a press release and a local news interview. It is undisputed that she made those statements following the publication of a scientific article she coauthored and that her remarks were directed to summarizing and explaining her research results to a lay audience. Docs. 150-2, 154-4, 154-5.

### 1. Relevant Law

Courts are "careful when applying defamation and related causes of action to academic works, because academic freedom is a 'special concern of the First Amendment.'" *ONY*, 720 F.3d at 496 (citing *Keyishian v. Bd. Of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967)). Accordingly, "scientific conclusions are protected speech to the extent they are 'draw[n] . . . from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement.'" *Pacira I*, 583 F. Supp. 3d at 658 (quoting *ONY*, 720 F.3d at 498).

As this Court previously noted, "[a]ccurate summaries of scientific conclusions are likewise not actionable statements for libel purposes, 'at least where the secondary statement was not made in connection with a consumer-facing advertisement.'" Doc. 35 at 2 (quoting *Pacira I*, 583 F. Supp. 3d at 661); *see also ONY*, 720 F.3d at 498.[2] Such

---

[2] Since *ONY*, district courts have described the secondary statement standard with varying phrases. *See, e.g., LTL Mgmt. LLC v. Moline*, No. 23-CV-2990, 2024 WL 3219683, at *13 (D.N.J. June 28, 2024) ("merely summarize"); *Pacira I*, 583 F. Supp. 3d at 661–62 ("fully accords with" and "entirely consistent with"); *Guardant Health, Inc. v. Natera, Inc.*, No. 21-CV-4062, 2025 WL 2106522, at *5 (N.D. Cal. July 28, 2025) ("merely reproduce and then accurately describe"); *Bayer Healthcare LLC v. Johnson & Johnson, Inc.*, __F. Supp. 3d __, 2026 WL

accurate "secondary statements," whether in a journal article, podcast, or other media, do not form the basis for a libel claim; "[t]o conclude otherwise would risk 'chilling' the natural development of scientific research and discourse." *Pacira BioSciences, Inc. v. Am. Soc'y of Anethesiologists, Inc. (Pacira II)*, 63 F.4th 240, 244, 248 (3d Cir. 2023). Courts decide as a matter of law whether statements about scientific research are protected by the First Amendment. *See ONY*, 720 F.3d at 492.

Following the relevant law, the Court refers to Dr. Schiffman's statements made in the press release and news interview as her "secondary statements," to distinguish them from statements in the underlying scientific article, which are not at issue.[3]

### 2. Dr. Schiffman's Statements Are Protected by the First Amendment

The safety of sucralose, and thus Splenda, constitutes a subject of legitimate ongoing scientific consideration and discussion. *See supra* at 8–9; *ONY*, 720 F.3d at 498. Dr. Schiffman's secondary statements in the press release and the news interview about her article constitute protected academic speech and cannot be the basis for a defamation claim unless the secondary statements are inaccurate descriptions of the article or the

---

1045917, at *18 (S.D.N.Y. Apr. 17, 2026) ("misrepresent" and "absence of . . . inaccurate representations"); *Cassava Scis., Inc. v. Bredt*, No. 22-CV-9409, 2024 WL 1347362, at *16 (S.D.N.Y. Mar. 28, 2024) ("republications of scientific conclusions" and "accurate representations of those conclusions"). For this order, the Court adheres to the shorthand "accurate summaries" as a common denominator to describe this standard. Doc. 35 at 2.

[3] In its amended complaint filed after the Court ruled on the motion to dismiss, Heartland has alleged that Dr. Schiffman's underlying research is fraudulent, Doc. 126 at ¶¶ 8, 11, 166, but its defamation claims continue to be based on her secondary statements about that research. *Id*. at ¶¶ 108–09, 112–13, 116–17, 180, 188, 197; *see also* Doc. 224 (Heartland's clarification of alleged defamatory statements). The Court discusses Heartland's allegations of fraud *infra*.

article was based on fraudulent data.  *See ONY*, 720 F.3d at 498; *Pacira I*, 583 F. Supp. 3d at 661.  Heartland has not pointed to evidence that establishes either.

### a. Dr. Schiffman's Statements are Accurate Summaries of Her Article

As demonstrated by the following table, each of Dr. Schiffman's challenged statements were "mere summary or repetition of an otherwise protected scientific opinion" and "did not misstate the article's conclusions."  *Pacira I*, 583 F. Supp. 3d at 661 (cleaned up).  Because her secondary statements all "fully accord with the conclusions of the article," they are not actionable.  *Id.* (cleaned up).

| Allegedly Defamatory Statements | Article Quotes |
|---|---|
| A new study finds a chemical formed when we digest a widely used sweetener is "genotoxic," meaning it breaks up DNA. The chemical is also found in trace amounts in the sweetener itself, and the finding raises questions about how the sweetener may contribute to health problems. . . . "Our new work establishes that sucralose-6-acetate is genotoxic," . . . "We also found that trace amounts of sucralose-6-acetate can be found in off-the-shelf sucralose," . . . "Our work suggests that the trace amounts of sucralose-6-acetate in a single, daily sucralose-sweetened drink exceed that threshold [of toxicological concern]." . . . "In short, we found that sucralose-6-acetate is genotoxic . . . ." | "Sucralose is a chlorinated artificial sweeter that is used worldwide . . . in thousands of food, beverage, and pharmaceutical products."  Doc. 150-2 at 3.<br><br>"The purpose of this study was to determine the toxicological and pharmacokinetic properties of sucralose-6-acetate, a structural analog of the artificial sweetener sucralose."  *Id*.<br><br>"Overall, the . . . findings for sucralose-6-acetate raise significant health concerns regarding the safety and regulatory status of sucralose itself."  *Id*.<br><br>"Data indicate the sucralose-6-acetate is genotoxic."  *Id*. at 13.<br><br>"sucralose-6-acetate significantly increased expression of genes associated with inflammation, oxidative stress, and cancer."  *Id*. at 23. |

14

| Allegedly Defamatory Statements | Article Quotes |
|---|---|
| | "examples of estimated sucralose-6-acetate content in common beverages" *Id.* at 24.<br><br>"single servings of sucralose containing drinks may contain levels of sucralose-6-acetate that exceed a [genotoxicity] rate by 4 orders of magnitude or more." *Id.*<br><br>"bioconversion of sucralose to sucralose-6-acetate" *Id.* at 26. |
| "When we exposed sucralose and sucralose-6-acetate to gut epithelial tissues – the tissue that lines your gut wall – we found that both chemicals cause 'leaky gut.' Basically, they make the wall of the gut more permeable. The chemicals damage the 'tight junctions,' or interfaces, where cells in the gut wall connect to each other. A leaky gut is problematic, because it means that things that would normally be flushed out of the body in feces are instead leaking out of the gut and being absorbed into the bloodstream." | "Both sucrolose-6-actetate and sucralose altered TEER and permeability in human colonic epithelial monolayers." *Id.* at 16.<br><br>"exposure of human intestinal epithelium to sucralose-6-acetate as well as sucralose itself damaged tight junctions and impaired intestinal barrier function." *Id.* at 23.<br><br>"Sucralose-6-acetate and sucralose reduced the transepithelial resistance and enabled ions and macromolecules to pass from the apical (luminal) to the basolateral side of intestinal epithelium through the paracellular pathways. Enhanced intestinal permeability (leaky gut) that enables passage of microorganisms and metabolites into the body plays a major role in IBD, chronic liver disease, as well as pathogenesis of colorectal cancer." *Id.* at 25 (internal citations omitted). |
| "We found that gut cells exposed to sucralose-6-acetate had increased activity in genes related to oxidative stress, inflammation and carcinogenicity." | "sucralose-6-acetate significantly increased expression of genes associated with inflammation, oxidative stress, and cancer." *Id.* at 23. |

15

| Allegedly Defamatory Statements | Article Quotes |
|---|---|
| "Yeah. Well, it breaks it up. That's a pretty big deal." | "Sucralose ingestion induced histopathological changes including lymphocytic infiltrates into the intestinal epithelium, glandular disorganization, and epithelial scarring." *Id*. at 4.<br><br>"Both sucrolose-6-actetate and sucralose altered TEER and permeability in human colonic epithelial monolayers." *Id*. at 16.<br><br>"Sucralose-6-acetate and sucralose reduced the transepithelial resistance and enabled ions and macromolecules to pass from the apical (luminal) to the basolateral side of intestinal epithelium through the paracellular pathways. Enhanced intestinal permeability (leaky gut) that enables passage of microorganisms and metabolites into the body plays a major role in IBD, chronic liver disease, as well as pathogenesis of colorectal cancer." *Id*. at 25 (internal citations omitted). |
| "And when it gets into the gut, it can induce genes, which are, you know, part of DNA, and it can cause inflammation and even cancer." | "sucralose-6-acetate significantly increased expression of genes associated with inflammation, oxidative stress, and cancer." *Id*. at 23.<br><br>"(MT) genes encode proteins that are biomarkers of inflammation, oxidative stress, and cancer." *Id*. at 26.<br><br>"Other genes for which expression was greater for sucralose-6-acetate than control were also implicated in cancer in some tissues." *Id*. at 27. |
| "Well, this is what's really interesting that we found, is that the amount of sucralose-6-acetate, this compound that is in a single packet of Splenda or in one drink, is enough to exceed what's called the -- it's | "The sucralose-6-acetate intermediate generated during the manufacturing process is retained as an impurity in commercial sources of sucralose." *Id*. at 3. |

16

| Allegedly Defamatory Statements | Article Quotes |
|---|---|
| called the threshold of toxicological concern. It's the level used in the food industry and in Europe, at the European food agencies, to say that this is too much genotoxic compound in the food supply. And so a single packet is too much." | "single servings of sucralose containing drinks may contain levels of sucralose-6-acetate that exceed a [genotoxicity] rate by 4 orders of magnitude or more." *Id.* at 24.<br><br>Cited source for seven article references: "Splenda alters gut microflora and increases intestinal P-glycoprotein and cytochrome P-450 in male rats." *Id.* at 29.<br><br>Cited source for two article references: "The artificial sweetener Splenda promotes gut proteobacteria, dysbiosis, and myeloperoxidase reactivity. . . ." *Id.* at 35. |
| "Okay. Risk wise, sucralose is worse [compared to other artificial sweeteners]."[4] | "Overall, the . . . findings for sucralose-6-acetate raise significant health concerns regarding the safety and regulatory status of sucralose itself." *Id.* at 3. |
| "So basically, the data shows it's not a good idea to consume sucralose."[5] | "These findings raise health and safety concerns regarding the continued presence of sucralose in the food supply." *Id.* at 29. |

Heartland contends that "ample evidence exists from which a jury can conclude" that Dr. Schiffman's statements about genotoxicity and health effects of S6A did not "'merely' summarize the 2023 article." Doc. 161 at 15. Putting aside whether that

---

[4] Alternatively, this challenged statement is non-actionable opinion. *See Craven*, 188 N.C. App. at 817. It is included in the table for the sake of completeness.

[5] *See supra* at note 4.

question is for the jury or the Court, an examination of the cited evidence does not support this contention.

First, Heartland challenges the conclusions that Dr. Schiffman drew from the results of the experiments and detailed in her secondary statements, suggesting that Dr. Schiffman did not sufficiently qualify her conclusions as preliminary or note the lack of definitive assessment as to toxicity in humans. Doc. 183-2 at 15–17.[6] But Dr. Schiffman used qualifying language in the N.C. State press release such as "the finding raises questions about how the sweetener may contribute to health problems," "our work suggests that," and "raises a host of concerns." Doc. 154-5 at 2–3. The university press release said that the article relied on "in vitro" experiments and tests. *Id*. at 3.

Even in the three-minute news interview, Dr. Schiffman was not definitive; she said that S6A "can" have negative health effects, Doc. 154-4; Doc. 154-66 at 5, not that it "will" or "does" cause inflammation and cancer. And during the interview, the reporter specifically referenced Dr. Schiffman's article, Doc. 154-66 at 4, which has a host of qualifying language such as "might far exceed," "may occur," "suggest that," and "indicated that," *e.g.,* Doc. 150-2 at 3, 6, 12–13, 27, and which specifically acknowledges, including in its title, that the tests were in vitro. *E.g., id*. at 3, 6–7, 9, 12, 25, 28. Thus, in a shorter fashion and directed to a lay audience, her secondary

---

[6] Heartland contends that the experiments conducted in vitro cannot lead to warnings about human health and points to expert testimony describing the experiments used in Dr. Schiffman's article as "screening-level," "exploratory," and "initial." Doc. 183-2 at 15–19 (citing Dr. Aliasger Salem's expert report Doc. 183-6 at ¶¶ 2–6, 53–54, 91–92; Dr. Salem's expert report Doc. 161-19 at ¶¶ 62–63, 68, 212, 220–24, 237, 260, 270; Dr. Salem's deposition Doc. 161-20 at 11, 14, 18–19; Dr. Tauseef Khan's expert report Doc. 161-3 at ¶¶ 52, 66–77).

18

statements repeat the conclusions that she made in the article based on the studies detailed in the article. *Id*. at 25–29. Heartland's cited evidence may undermine the strength of those conclusions, but it does not undermine the accuracy of Dr. Schiffman's secondary statements describing her article's conclusions. *See* Doc. 161 at 15–16.

To the extent Heartland is saying that the secondary statements are not nuanced enough, that argument if adopted would essentially prohibit scientists from commenting on sophisticated research to a lay audience beyond reading their study results in full. And Dr. Schiffman's secondary statements were not so over-simplified as to be inaccurate.

Heartland says that Dr. Schiffman's statement that S6A "can cause inflammation *and even cancer*" is not supported by the article. *Id*. at 16 (emphasis supplied by Heartland). But the article's findings state that S6A "significantly increased expression of genes associated with inflammation, oxidative stress, and cancer," Doc. 150-2 at 3, 23, as well as genes that "were also implicated in cancer in some tissues." *Id*. at 27. This statement also is consistent with additional references to "cancer" in the three instances noted in the above table and elsewhere in the article. *Id*. at 3, 5, 19, 23, 25–29, 31–37. Here again, Dr. Schiffman's secondary statements were not so over-simplified as to be inaccurate, and her summary secondary statements about cancer are not actionable.

Heartland challenges Dr. Schiffman's statements that the genotoxicity finding was a "pretty big deal" and that when asked "How much Splenda or sucralose needs to be consumed in order for this to be harmful?" her response was "a single packet . . . is too much." Doc. 161 at 17. It is difficult to see how her assertion that her research was "a pretty big" deal defames Heartland, and in context she is expressing an opinion. Putting

19

that aside, these statements are consistent with statements in the article (1) discussing "significant health concerns regarding the safety . . . of sucralose itself," Doc. 150-2 at 3; (2) emphasizing up front the ubiquity of sucralose and its consumer product presence and stating that it "is used worldwide as a sugar substitute in thousands of food, beverage, and pharmaceutical products," *id*.; (3) discussing the potential genotoxicity of "a single daily sucralose-sweetened drink" and "single servings of sucralose," *id*. at 3, 24; and (4) relying upon other scientific studies that have examined Splenda, specifically, and have referenced Splenda in their titles. *Id*. at 4, 5, 24–26, 29, 35.

Heartland suggests that Dr. Schiffman should not have mentioned Splenda in her secondary statements because she "did not directly test Splenda sucralose for S6A for the 2023 Article." Doc. 161 at 5 (cleaned up); *see* Doc. 161 at 17; Doc. 224 at 2–3. But it is undisputed that Splenda is composed of sucralose, Doc. 126 at ¶ 27; Doc. 132 at ¶¶ 27, 29, and "sucralose" is a subject of Dr. Schiffman's study. Doc. 150-2 at 3.

Heartland contends that Dr. Schiffman "cannot claim First Amendment protection for scientific opinions about one substance [S6A] by pointing to articles about an entirely different substance," sucralose. Doc. 161 at 18. This contention is inapposite, again, first because it challenges Dr. Schiffman's research methods and data, rather than the accuracy of her secondary statements, and second because the article itself is replete with discussion concerning research about sucralose; it repeatedly compares, supports, and relates such research to Dr. Schiffman's own research on S6A. *See* Doc. 150-2 at 4–6, 18–29. The title of the article demonstrates it is about both S6A "and its parent sucralose." *Id*. at 3. The opening sentence of the article states that "Sucralose is a

chlorinated artificial sweeter that is used worldwide as a sugar substitute in thousands of food, beverage, and pharmaceutical products." *Id*. Heartland's criticism of Dr. Schiffman's scientific approach does not support its defamation claim.

Heartland challenges the "overall message" of the press release and interview. Doc. 224 at 4. But the overall message of the press release and interview is stated at the outset of both: they are about Dr. Schiffman's "new study" and research. Doc. 154-5 at 2; Doc. 154-66 at 4. As shown in the table, *supra* at 14–17, the summary statements in the press release and interview are consistent with the statements in the article. Heartland's challenge to Dr. Schiffman's overall message "must be settled by the methods of science rather than by the methods of litigation." *ONY*, 720 F.3d at 497 (cleaned up). "More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us." *Id.* (cleaned up).

Heartland cites *Guardant Health* in support of its argument that Dr. Schiffman's speech is not a mere summary of her article. Doc. 161 at 15. But *Guardant Health* concerned false advertisement claims in commercial advertisements directed to customers. *Guardant Health*, 2025 WL 2106522, at *5. Here, Dr. Schiffman is not a competing corporation making such "comparison advertisements." She coauthored a published scientific study with which Heartland disagrees.

Heartland also cites *Hi-Tech Pharmaceuticals, Inc. v. Cohen*, 277 F. Supp. 3d 236, 245 (D. Mass. 2016). Doc. 161 at 15. In that case, the court declined to follow the Second Circuit's lead in *ONY* because its circuit court had not done so, and the court

21

alternatively found without much discussion that the defendant did not produce evidence that each of the *ONY* conditions were met as a matter of law.  *Hi-Tech Pharms.*, 277 F. Supp. 3d at 245.  To the extent the *Hi-Tech* court did not follow the analysis of the Second Circuit in *ONY* and, by extension, the analysis in *Pacira I*, the Court does not find that opinion persuasive.  And here, Dr. Schiffman has shown that her statements accurately reflect her research, so on that point *Hi-Tech* is distinguishable.

### b.  Dr. Schiffman's Article is Not Based on Fraudulent Data or Inaccurate Descriptions of the Data

Heartland also contends that Dr. Schiffman's 2023 article is based upon fraudulent data so that her later secondary statements about her research are not protected by the First Amendment.  The evidence, viewed in the light most favorable to Heartland, does not show the kind of fraudulent data necessary to set aside the protections of the First Amendment.

Heartland maintains that the article constitutes "fraud" based on its disagreements with her results, methodology, and decisions about what to include in and omit from her published research.  Doc. 161 at 20–21.  But omitting data does not necessarily make research fraudulent.  *See ONY*, 720 F.3d at 494, 499 (holding that scientific opinions were protected by the First Amendment even when the plaintiff alleged that the defendant omitted data); *Pacira I*, 583 F. Supp. 3d at 657–59 (holding that allegations of cherry-picking and omitting data cannot survive a motion to dismiss because the data is nonfraudulent).  Similarly, Heartland's complaints about what experiments Dr. Schiffman chose to run or how they were run is a complaint about methodology and does not make

22

the data in the article fraudulent. *ONY*, 720 F.3d at 494–95, 499 (complaints about omission and failure to cite contrary data amount to objections to scientific methodology); *Pacira I*, 583 F. Supp. 3d at 659–60 (rejecting the plaintiff's attempt to recast flaws in methodology as false descriptions of data).

Heartland contends that Dr. Schiffman's omissions differ from those in *ONY* because the data in *ONY* was not fraudulently created and was already publicly disclosed. Doc. 161 at 21. But using the phrase "fraudulently created" in a brief does not make it so, and Heartland has offered no evidence that the numbers in the studies were made up or that the tests were not conducted. Heartland has simply tried another way of framing its disagreement with Dr. Schiffman's methodology and conclusions. Heartland and others can run their own tests following the same methodology or using methodology they say is better or more complete, and they are free to use their results to publicly rebut Dr. Schiffman's results if that is what such research shows. Courts are not in the best position to analyze disputed scientific methodology; rather those disputes should be posed to the marketplace of ideas. *ONY*, 720 F.3d at 496–97.

Heartland asserts that an investigation by N.C. State, Dr. Schiffman's employer, into Dr. Schiffman's research as reflected in the article undermines Dr. Schiffman's motion for summary judgment. *See* Doc. 251 at 4.[7] But if anything, that article supports Dr. Schiffman's position.

---

[7] Heartland contends, in summary, that a report of the investigation should not be considered as it was filed after close of discovery and summary judgment briefing. Doc. 251. Both parties have had an opportunity to address the report's effect on summary judgment, and Heartland has long known that N.C. State was investigating Dr. Schiffman's research article based on claims

According to the investigation report, a vice chancellor convened a panel of professors to investigate whether Dr. Schiffman committed research misconduct based on Heartland's allegations in this case that she (1) omitted contradictory data and (2) did not disclose conflicting repeat tests. Doc. 226-2 at 3–4. The committee concluded that Dr. Schiffman did not follow "best practices" because she "should have reported the negative Multiflow data from Litron Laboratories in the article" and that a discussion of the reason behind the differing results "would have been appropriate and . . . followed best practices." *Id*. at 7. The committee stated that the exclusion of some data "should have been discussed with all coauthors of the article." *Id*.

The committee also unanimously concluded that Dr. Schiffman did not commit "research misconduct" because she provided a reason for the omission. *Id*. It specifically declined to make any finding that Dr. Schiffman's omission "was done with the specific 'intent to intentionally mislead.'" *Id*. at 7–8. The report thus does not create a question as to whether the article "draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions." *ONY,* 720 F.3d at 498.

---

Heartland makes in this lawsuit. Heartland also moves to reopen discovery to serve a subpoena and take third-party depositions of individuals involved in the investigation. Docs. 253, 258. Given the already extensive discovery Heartland has been allowed to conduct in this case to investigate its claims, allowing any additional discovery–much less the extensive and unduly burdensome discovery that Heartland proposes–would be disproportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(2)(C)(iii). It is highly likely that the third party in possession of the information Heartland now wants would resist such discovery, and even if it doesn't or such resistance is unsuccessful, it is unlikely anything new and material would turn up; Heartland has had every opportunity to investigate Dr. Schiffman's research and has done so *ad nauseum*. The only point of the requested discovery is to increase expenses to all parties without corresponding benefit to resolution of the issues. In any event, the report is not determinative of any issue.

As noted *supra*, courts decide as a matter of law if a statement receives the protection of the First Amendment. *Id.* at 492. Failing to use best practices does not equate to fraud, and nothing in this report supports Heartland's assertion that Dr. Schiffman used fraudulent data or did not accurately describe the data and methodology underlying those conclusions.

Heartland cites multiple cases in support of its fraud argument, but each case is distinguishable. In *CrossFit, Inc. v. National Strength & Conditioning Ass'n*, the court denied summary judgment to the defendant on First Amendment grounds on false advertising claims because there were triable issues of fact concerning whether the defendant's conclusions were fraudulent. No. 14-CV-1191, 2016 WL 5118530, at *7 (S.D. Cal. Sep. 21, 2016). Also, the court found that the speech was commercial, and the peer-reviewed journal issued a correction, *id*. at *7–8, neither of which is the case here. *In re Neurontin Marketing & Sales Practices Litigation* also involved claims of using cherry-picked data to sell more drugs. No. 4-CV-10739, 2011 WL 3852254, at *17 (D. Mass. Aug. 31, 2011), *aff'd*, 712 F.3d 21 (1st Cir. 2013). *U.S. ex rel. Jones v. Brigham & Women's Hospital* is a False Claims Act case that makes no mention of the First Amendment. 678 F.3d 72, 75 (1st Cir. 2012).[8]

---

[8] The First Circuit in *Jones* noted that in the FCA context "expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false." 678 F.3d at 87. If that test of falsity is applied here, Heartland would lose, because the evidence at least shows that reasonable minds may differ about the appropriate conclusions to draw from Dr. Schiffman's research.

25

### 3. Alternatively, Heartland has not Shown Actual Malice

Because Dr. Schiffman is a public figure, Heartland must show that she made her challenged statements with actual malice. *Sullivan*, 376 U.S. at 279–80. "Actual malice" requires a plaintiff to prove that alleged defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280. Evidence of personal hostility alone cannot show actual malice. *Cannon*, 36 F.4th at 568. Under North Carolina defamation law, actual malice must be shown "with convincing clarity." *Lewis v. Rapp*, 220 N.C. App. 299, 303, 725 S.E.2d 597, 601 (2012). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [her] publication." *Id.*

Heartland points to several categories of evidence in an effort to show actual malice: (1) the omissions of data from the article, *see supra* at 22–25; (2) an opinion by a third-party scientist that Dr. Schiffman had bias towards the research outcome because she omitted test results, Doc. 153-49 at 2; (3) funding she received from the Sugar Association over 15 years ago, Docs. 161-8, 161-9; and (4) an email about seeking funding broadly from different entities for her research. Doc. 161-23. None of this evidence tends to show with convincing clarity that Dr. Schiffman "in fact entertained serious doubts as to the truth of [her] publication." *Lewis*, 220 N.C. App. at 303.

Perhaps the omissions would allow a jury to conclude that Dr. Schiffman did not follow best practices in her research, but that is not a material question of fact and any such conclusion would not by itself establish malice with convincing clarity. The opinion evidence is of questionable materiality, and the remaining evidence about funding is too

26

remote and speculative to permit an inference that she acted with malice in making the secondary statements.

In a similar case affirming the dismissal defamation claims for lack of malice, the Seventh Circuit noted that "[s]cientific truth is elusive. Nothing in this record suggests, however, that [the defendant] either knew that she was writing falsehoods or feared that she might be doing so but barged ahead without checking." *Underwager v. Salter*, 22 F.3d 730, 735 (7th Circ. 1994). In this context, "[m]ore papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us." *Id.* at 736.

In sum, no genuine issue of material fact exists as to actual malice. Dr. Schiffman has established that she is entitled to summary judgment on Heartland's defamation claims, and her motion for summary judgment will be granted.

### VII. Dr. Schiffman's Counterclaims Against Heartland

Dr. Schiffman's defamation counterclaims are based on the following statement on Heartland's website:

> [I]n an attempt to make headlines, Dr. Susan Schiffman, the author of a May 2023 article about a chemical compound called sucralose-6-acetate ("S6A"), falsely claimed that Splenda contains S6A and that after we consume Splenda, the sucralose in Splenda turns into S6A inside the body and causes DNA damage, gene damage, or is genotoxic. These claims are false. The article is not sound science and its findings have no impact on the safety of Splenda.

Doc. 162-18 at 2. Heartland moves for summary judgment on all of Dr. Schiffman's defamation counterclaims, contending *inter alia* that portions of the allegedly defamatory

statement are non-actionable, protected opinion and that she cannot prove actual malice or damages.

### A. The First Amendment Protects Heartland's Statements

The First Amendment protects Heartland's challenged statement that are opinions incapable of being proven false. *See Milkovich,* 497 U.S. at 19–20; *Craven*, 188 N.C. App. at 817. The phrase "in an attempt to make headlines," represents Heartland's opinion of Dr. Schiffman and her actions in vague terms and cannot be proven false. Doc. 162-18 at 2; *see Biospherics, Inc.*, 151 F.3d at 185 (stating "the vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable" (cleaned up)). The assertion that Dr. Schiffman's article is "not sound science" is also an opinion incapable of being proven false, because it is vague and encompasses many meanings. Doc. 162-18 at 2. Heartland made these assertions on its website to combat the negative publicity resulting from media attention given to Dr. Schiffman's article and to convince consumers that its product was safe. *Id*.; *see Biospherics, Inc.*, 151 F.3d at 184 (explaining that courts look to a statement's language and context to determine if it could be interpreted as asserting a fact).

Other parts of the statement receive First Amendment protection as scientific conclusions on a "subject about which there is legitimate ongoing scientific disagreement." *Pacira I*, 583 F. Supp. 3d at 658 (cleaned up). The safety of sucralose and Splenda was an ongoing debate before the publication of Dr. Schiffman's article. *See, e.g.*, Docs. 162-5, 162-7.

28

Just as Dr. Schiffman may go on news shows and talk about her findings and her opinions on the safety of sucralose and Splenda, Heartland may post on its website its view that the claims in her research are false or inaccurate and provide its explanation of why it believes her data and results are wrong, based on other studies contradicting her findings. Doc. 162-18 at 3–12. Dr. Schiffman has made no showing that Heartland's views and beliefs are themselves capable of being proved false. Its criticisms of Dr. Schiffman's scientific findings and methodology are protected by the First Amendment. *See ONY*, 720 F.3d at 497 ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation." (cleaned up)); *see also Arthur v. Offit*, No. 09-CV-1398, 2010 WL 883745, at *5–6 (E.D. Va. Mar. 10, 2010) (noting that statements are not actionable when made "in the context of a heated and very public scientific debate" that "threatens to ensnare the Court in the thorny and extremely contentious debate over" scientific questions associated with vaccines).

Heartland's motion for summary judgment on these counterclaims will be granted.

### B. Abuse of Process

In addition to her defamation claims, Dr. Schiffman brings an abuse of process claim against Heartland. Doc. 128 at ¶¶ 23–72. Heartland moves for summary judgment on this claim. Doc. 154 at 2.

"[A]buse of process is the misuse of legal process for an ulterior purpose. It consists in the malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commended by the writ." *Fowle v. Fowle*, 263 N.C. 724, 728, 140 S.E.2d 398, 401 (1965). In other words, "abuse of process

29

requires both an ulterior motive and an act in the use of the legal process not proper in the regular prosecution of the proceeding, and that both requirements relate to the defendant's purpose to achieve through the use of the process some end foreign to those it was designed to effect." *Stanback v. Stanback,* 297 N.C. 181, 201, 254 S.E.2d 611, 624 (1979) (cleaned up); *Chidnese v. Chidnese*, 210 N.C. App. 299, 310–11, 708 S.E.2d 725, 734–35 (2011).

Dr. Schiffman contends that Heartland filed the lawsuit to silence, intimidate, and discredit her, "to financially cripple" her, to "send a message that anyone who publishes anything about Splenda that Heartland dislikes will face the same treatment," Doc. 162 at 25, and that to that end it used a legal process to obtain irrelevant and costly discovery from third parties and to send such discovery materials to Dr. Schiffman's publisher. *Id.* at 26–27. But in the entirety of her discussion of this claim, she cites only her own unverified amended counterclaim and two internal email threads about Heartland's marketing response to the WHO report. *Id*. at 24–29 (repeatedly citing amended counterclaim at Doc. 128 and also citing at 28 "Exhibit P," Doc. 176-17, and "Exhibit F," Doc. 181-7).[9] Unverified complaints are not evidence, and nothing in those emails establishes ulterior motive as to Dr. Schiffman or improper use of process.

Anyone who delves into the record and procedural history of this case would easily have suspicions about Heartland's motives. But suspicions are not evidence. Dr. Schiffman has not directed the Court to evidence that creates a disputed question of fact,

---

[9] There do not appear to be any facts in Dr. Schiffman's initial statement of facts, Doc. 162 at 2–3, that are material to her abuse of process claim.

and the Court need not itself scour the record looking for such evidence. *See, e.g.*, *Freeland v. Long Beach Mortg. Co.,* 741 F. Supp. 3d 314, 316 (M.D.N.C. 2024); *Hughes v. B/E Aerospace, Inc.*, No. 12-CV-717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

Heartland's motion for summary judgment on this counterclaim will be granted.

## VIII. Conclusion

When a company makes health claims about its product and sells a lot of it, it has to expect that someone, somewhere, sometime, will investigate whether that product is in fact healthy or unhealthy or safe or unsafe. The First Amendment does not require a scientist to defend research studies in court merely because a company whose sales of a product might be affected by publicity about that research disagrees with the research or dislikes the publicity. That is all Heartland has shown here: it disagrees with Dr. Schiffman's research and is unhappy that some consumers asked questions about it. Allowing this case to go to trial would chill the First Amendment rights of all scientists to speak about their research and would make any sensible scientist question whether to conduct such research at all, chilling a different aspect of their First Amendment rights.

Neither party has produced sufficient evidence to overcome the other's First Amendment privilege to express their opinions and views or to establish disputed questions of material fact. All claims and counterclaims will be dismissed.

It is **ORDERED** that:

1. The defendant's motion for summary judgment, Doc. 149, is **GRANTED**.

31

2. The plaintiff's motion for summary judgment, Docs. 153, 154, is **GRANTED IN PART** as it relates to the defendant's counterclaims and to the publication element of its defamation claims, but **DENIED IN PART** as it relates to the public figure element of its defamation claims.

3. In the Court's discretion, the plaintiff's motion to reopen discovery, Doc. 253, is **DENIED.**

4. The parties' *Daubert* motions, Docs. 204, 206, 208, 210, are **DENIED** as moot.

5. The consent motion to continue the trial, Doc. 244, is **DENIED** as moot.

6. Motions to seal, Docs. 148, 151, 169, 171, 174, 176, 178, 180, 182, 189, 191, 235, 239, 243, remain pending and will be addressed by separate order.

7. Judgment will be entered separately as time permits.

This the 22nd day of June, 2026.

_____
UNITED STATES DISTRICT JUDGE